# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BRIDGET BITTMAN, | ) |
| Plaintiff, | ) |
| | ) No. 14 C 08191 |
| v. | ) |
| | ) Judge John J. Tharp, Jr. |
| MEGAN FOX, *et al.*, | ) |
| Defendants. | ) |

## ORDER

For the reasons stated more fully below, Defendant Dan Kleinman's motion to dismiss the second amended complaint against him for lack of personal jurisdiction [103] is granted, and this case is terminated.

## STATEMENT

In this lawsuit, plaintiff Bridget Bittman, a marketing and public relations professional employed by the Orland Park Public Library, alleges that the defendants[1] undertook "efforts to defame, discredit, disparage and damage Ms. Bittman's reputation and thereby cause her to suffer harm." This court previously granted the motion to dismiss of one of the defendants, Dan Kleinman, for lack of personal jurisdiction. Order, ECF No. 89. Bittman thereafter filed a Second Amended Complaint ("SAC"). SAC, ECF No. 91. In the SAC Bittman still fails to allege that Kleinman created sufficient case-specific contacts with the state of Illinois to establish a *prima facie* case that the Court has specific personal jurisdiction over Kleinman.

### Facts

In deciding a motion to dismiss under Rule 12(b)(6) or Rule 12(b)(2), the Court takes as true all well-pleaded facts alleged in the complaint and resolves any factual disputes in the affidavits in favor of the plaintiff. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2012) (Rule 12(b)(6)); *Felland v. Chilon*, 682 F.3d 665, 672 (7th Cir. 2012) (Rule 12(b)(2)).

The backdrop to this law suit is an ongoing debate between two camps with different views about the materials that should be accessible in public and school libraries. Defendant Kleinman is a vocal critic of open-Internet policies advanced by some libraries and the American Library Association that he believes make sexually inappropriate materials available in libraries; Kleinman authors a blog called SafeLibraries and describes himself as a "'library watchdog' and journalist who has voiced critical opinions about library policies and practices, nationwide,

---

[1] All individual defendants other than Mr. Kleinman have now been dismissed.

which allow library patrons to access and view pornography on public library computers." According to Bittman, Kleinman is a "close associate" of defendants Fox and Dujan and works in concert with them to promote "safe libraries." Bittman and others in the library community generally defend broader access policies on free speech and anti-censorship grounds. From the information already at issue in this case, which is still in the pleadings stage, the behavior of some of the partisans in both camps bears little resemblance to the sort of substantive and respectful public discourse that should ideally characterize debates about important public policy issues and instead exemplifies the sort of juvenile tactics one would expect to see the antagonists in a schoolyard playground argument employ. This lawsuit arises from such an encounter.

The SAC maintains the same core allegations against Kleinman as the last complaint. Specifically, Bitman alleges that on July 27, 2014, Kleinman published on his "Safe Libraries" blog a video taken by defendants Fox and Dujan, entitled "Bridget Bittman commits Disorderly Conduct/Breach of Peace on 7/8/14," with this allegedly untruthful title and other allegedly defamatory commentary placed into captions. The video, which is central to the complaint and properly considered on this motion, records an encounter in the parking lot of the Orland Park library between Bittman and Diane Jennings, a trustee of the Orland Park library, on the one hand, and Fox, Dujan, and John Kraft, another "safe libraries" activist, on the other. As seen in the video, after leaving the library, Bittman and Jennings approach Fox, Dujan, and Kraft, who are standing on the sidewalk nearby videotaping them and a brief argument ensues in which the activists refuse to move out of Bittman's path and Jennings launches a number of expletives at Kraft, whose own tone and comments are also uncivil. The activists also claim, in subsequent publications of the video and related commentary, that Bittman and Jennings directed anti-gay slurs at Dujan during the encounter, but at that point the background noise on the recording drowns out the audio and no such comments by Bittman are discernible (at least on the basis of the video available on Kleinman's blog). The entire incident lasted less than 90 seconds and could have been avoided entirely if either side had behaved maturely and gone about their business rather than provoking the opposing group. Instead, several of the antagonists—specifically, Bittman, Fox, and Dujan, engaged in almost three years of litigation before settling their dispute.

Defendant Kleinman, who is a resident of New Jersey and claims never to have set foot in Illinois, had nothing to do with this encounter. He finds himself embroiled in this lawsuit, however, because he posted the video, and some related commentary, on the "safe libraries" blog he publishes from his home. The SAC alleges that two statements made by Kleinman were defamatory. Kleinman's July 27 blog post, *see* http://safelibraries.blogspot.com/2014/07/gay-hate-at-your-library.html, is entitled "Gay Hate @ Your Library." In it Kleinman writes that the video shows Bittman "attack[ing] a gay man." The SAC refers to this statement as the "Republication Statement." SAC ¶ 98, ECF No. 91. Bittman further alleges that—at some unspecified time and place—Kleinman has characterized her as a "homophobe," and that on August 21, 2014—again, with no context specified—"defendant Kleinman expressly characterized Ms. Bittman as a 'gay hater'"; she dubs the latter statement "the Gay Hater Statement." *Id*. ¶¶ 138-139. According to the SAC, "Ms. Bittman is not a 'gay hater' or 'homophobe.'" *Id*. ¶ 140.

2

In addition to reprising these allegations from the First Amended Complaint, the SAC also contains the following new allegations about Kleinman and his contacts with the state of Illinois:

> Defendant Kleinman further republished the July 8 Video by providing a link to the July 8 Video in comments he made in response to articles found on the website known as Illinois Leaks: Edgar County Watchdogs ("Edgar County Watchdogs"). Edgar County Watchdogs is a website on which articles appear relating to numerous counties in the State of Illinois. Edgar County Watchdogs posts numerous articles regarding the Defendants' interactions with the Orland Park Public Library. Along with the link to the July 8 Video he posted on the Edgar County Watchdogs website, Defendant Kleinman again falsely stated that Ms. Bittman "attacked a gay man." Defendant Kleinman further republished the July 8 Video by providing a link to the July 8 Video in comments he made to an article [sic] concerning the Orland Park Public Library on the website for the Chicago Tribune. Defendant Kleinman further republished the July 8 Video by providing a link to the July 8 Video in multiple tweets published through the social media platform Twitter using his handle @safelibraries.

SAC ¶¶ 100-106, ECF No. 91.

As to Kleinman's contacts with Illinois, Bittman now alleges:

> Kleinman has availed himself of Illinois laws by filing numerous Freedom of Information Act ("FOIA") requests related to Bittman's position at the Orland Park Public Library, pursuant to the Illinois Freedom of Information Act, 5 ILCS 140/1, *et seq*. Further, Kleinman directed his conduct toward Ms. Bittman in this jurisdiction by appearing via video-teleconference at Orland Park Public Library Board meetings. Additionally, Kleinman has further availed himself of Illinois laws by filing a complaint with the Illinois Attorney General in relation to Orland Park Public Library meetings and alleged violations of the Illinois Open Meetings Act, 5 ILCS 120/1, *et seq*. In a further effort to harm Ms. Bittman in this jurisdiction, Kleinman posted comments relating to his wrongful conduct in response to several Chicago Tribune articles about the Orland Park Public Library on the Chicago Tribune website (per example, http://www.chicagotribune.com/ suburbs/dailysouthtown/news/ctstaorlandlibrarysettlest03202015 0319story). In addition, he posted comments to articles found on a website known as Illinois Leaks: Edgar County Watchdogs ("Edgar County Watchdogs") that reports on activities in Cook County and the surrounding Illinois counties (per example,

http://edgarcountywatchdogs.com/2014/07/orland-park-library-officials-call-people-fruit-faggotgay/).

SAC ¶¶ 13-16, ECF No. 91.

The SAC alleges, in relevant part, that Kleinman defamed Bittman and committed the tort of false light invasion of privacy. Counts Five and Six, as they pertain to Kleinman, seek relief for the republication of the July 8 video with the "Republication Statement." Counts Eight and Nine are directed at Kleinman's "Gay Hater Statement." Kleinman again moves to dismiss the Bittman's complaint for lack of personal jurisdiction and failure to state a claim.

## DISCUSSION

Kleinman argues that Bittman has not cured any of the deficiencies with regard to personal jurisdiction that this Court noted in its prior order. He again contends, as this Court previously concluded, that he is not subject to general personal jurisdiction because he has never been to Illinois, does not own property here, do business here, or otherwise engage in ongoing contact that makes Illinois his "home." Kleinman further argues that he does not have sufficient litigation-related contacts to allow for specific personal jurisdiction. Kleinman operates his blog from his home in New Jersey. He also contends that he has never directed any blog post toward Illinois readers and that he has never directed "any activities, let alone tortious activities" toward Bittman or Illinois.

A federal court in Illinois may exercise personal jurisdiction over Kleinman if the Illinois long-arm statute would allow it. *See* Fed. R. Civ. P. 4(k)(1)(A); *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). Because Illinois' statute contains a catch-all provision that permits personal jurisdiction if it would be authorized by either the Illinois Constitution or the United States Constitution, the state statutory and federal constitutional requirements merge. *Id.*; *see* 735 Ill. Comp. Stat. 5/2-209(c).

Personal jurisdiction may be "general" or "specific." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014); *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 318 (1945). General personal jurisdiction exists where the defendant's continuous operations within the forum state are "so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Daimler AG*, 134 S. Ct. at 754 (quoting *Int'l Shoe Co.*, 326 U.S. at 318). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011).

Bittman, again, apparently does not dispute that the courts of Illinois would lack general personal jurisdiction over Kleinman. And given that Kleinman has never been to the state, it is plain that it is not his domicile, and Bittman has not alleged "continuous operations" or contacts that could possibly subject him to general personal jurisdiction in Illinois. Therefore, once again, the question is solely whether the Illinois courts could exercise specific personal jurisdiction against Kleinman with respect to the defamation and false-light claims based on the Republication and Gay-Hater statements.

Specific personal jurisdiction exists if Bittman's defamation and false-light claims against Kleinman arise out of Kleinman's constitutionally sufficient contacts with the forum state. *See uBID, Inc.*, 623 F.3d at 425; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). "The key question is therefore whether the defendant [has] sufficient 'minimum contacts' with Illinois such that the maintenance of the suit 'does not offend traditional notions of fair play and substantial justice.'" *Tamburo v. Dworkin*, 601 F.3d 693, 700-701 (7th Cir. 2010), citing *Int'l Shoe Co.,* 326 U.S. at 316. Specific jurisdiction requires that (1) the defendant has purposely directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in the state, and (2) the alleged injury arises out of the defendant's forum-related activities. *Id*. at 702, citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

As in its previous ruling, this Court finds *Calder v. Jones*, 465 U.S. 783 (1984), and the Seventh Circuit's *Tamburo* decision instructive. In *Calder*, the Supreme Court held that California could exercise personal jurisdiction in a libel action over the author and editor of an article published in the *National Inquirer* about the actress Shirley Jones, although the defendants were Florida residents, the article was written and edited there, and the tabloid was a Florida corporation. *See id*. at 785-86. The Supreme Court reasoned:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the "effects" of their Florida conduct in California.

*Calder,* 465 U.S. at 788-89. The Court further reasoned that the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California" where "they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation." *Id*. at 789-90.

In *Tamburo*, the Seventh Circuit primarily drew upon *Calder* when charged "to apply long-established rules for asserting personal jurisdiction over foreign defendants to the relatively new setting of torts committed over the Internet." 601 F.3d at 697. There, the owners of websites providing free information about dog breeds were sued for defamation and various business torts after they published critical posts about and encouraged a boycott of the operator of a dog-breeding software company who had used information from those websites. The Seventh Circuit began its analysis by extracting from *Calder* three "requirements" to show "purposeful direction," namely: "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703. As to the key inquiry—whether website operators had "expressly aimed" their conduct at the state of Illinois, the appellate court answered in the affirmative, reasoning that the individual defendants "published false and defamatory statements" about plaintiff, encouraged a boycott of his

5

business, and published his address urging readers to contact and harass him, all "with the knowledge that Tamburo lived in Illinois and operated his business there." *Id*. at 706. "Thus, although they acted from points outside the forum state, these defendants specifically aimed their tortious conduct at Tamburo and his business in Illinois with the knowledge that he lived, worked, and would suffer the 'the brunt of the injury' there." *Id.*

Since *Calder*, and even since *Tamburo*, however, the Supreme Court has further clarified that the situs of the plaintiff's injury is relevant but not sufficient to establish minimum contacts. *Walden v. Fiore*, 134 S. Ct. 1115 (2014), emphasized that the relation between the foreign defendant and the forum state "must arise out of contacts that the 'defendant *himself*' creates with the forum State. 134 S. Ct. at 1122, citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (emphasis in original). Furthermore, the analysis "looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* Finally, the Court clearly stated that "the plaintiff cannot be the only link between the defendant and the forum"; rather, it "is the defendant's conduct that must form the necessary connection with the forum State." *Id*. All of these principles apply with equal force when intentional torts are alleged. *Id*. at 1123. The *Walden* Court stated that these principles had driven the result in *Calder* because in that case, the defendants had developed their story by contacting sources located in California and "wrote an article for publication in California," where they knew that their tabloid had its largest circulation (of more than 600,000 copies) and would be most likely to damage Jones's reputation there. *Id*. at 1124. The reputational injury incurred as a result of the article being read by hundreds of thousands of readers in California "connected the defendants' conduct to *California,* not just to a plaintiff who lived there." *Id*. By contrast, the Court concluded, personal jurisdiction was lacking in *Walden* because the location of the plaintiff's injury was not a sufficient contact with the forum state of Nevada. *Id.* at 1125. There, the plaintiff alleged that the defendant police officer's intentionally tortious conduct in Georgia—wrongfully seizing and retaining the plaintiffs' cash and submitting a false probable cause affidavit in support of a forfeiture action—was not sufficient to support personal jurisdiction in Nevada, even if the defendant acted with the knowledge that his conduct would injure the plaintiffs in Nevada.

Building on *Walden*, the Seventh Circuit held in *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014), that the district court erred in concluding that personal jurisdiction could be exercised in a trademark case over a defendant maker of projectile irritants that allegedly misled consumers into believing it was the only maker of PepperBall products. The Court held that there was no personal jurisdiction over the defendant, Real Action, in Indiana, despite the following contacts: "Real Action fulfilled several orders of the allegedly infringing projectiles for purchasers in Indiana; second, it knew that Advanced Tactical was an Indiana company and could foresee that the misleading emails and sales would harm Advanced Tactical in Indiana; third, it sent at least two misleading email blasts to a list that included Indiana residents; fourth, it had an interactive website available to residents of Indiana; and finally, it put customers on its email list when they made a purchase, thereby giving the company some economic advantage." *Id* at 801. The Seventh Circuit reasoned that the plaintiff has no evidence of any actual sales by Real Action in Indiana, and that, in any event, *de minimis* sales would not support personal jurisdiction. *Id*. Moreover, the foreseeability of the plaintiff's injury in Indiana, its home state, was not relevant to whether the defendant itself had created contacts with the forum state. *Id*. at 802. Finally, the defendant's online activities—"the sending of two allegedly misleading emails to a list of subscribers that included Indiana residents

and the maintenance of an interactive website"—did not show that the defendant "targeted Indiana somehow." *Id*. at 803-803.

Previously, this Court held that Bittman's allegations were insufficient to make out a *prima facie* case of specific personal jurisdiction because, in summary, the fact that Kleinman republished and commented upon a video concerning an Illinois resident employed by an Illinois library on a subject-specific "watchdog" website that is accessible by anyone, anywhere, did not constitute conduct "expressly aimed at" the State of Illinois. In particular, this Court noted that operating even an "interactive" website "should not open a defendant up to personal jurisdiction in every spot on the planet where that interactive website is accessible." *Advanced Tactical Ordnance Systems*, 751 F.3d at 803. This Court further noted that Bittman had not plausibly alleged any concerted activity between Kleinman and defendants (and Illinois residents) Fox or Dujan, such as having contacted them as "sources" for his blog post rather than republishing their publicly available content wholesale. Nor had Bittman plausibly alleged that Kleinman had reason to believe that his blog post would be *read* widely (or even at all) in Illinois; there are no allegations that the blog has an Illinois readership, let alone a significant one, in marked contrast to *Calder*. In short, Bittman had not shown any connection between Kleinman's allegedly defamatory conduct and the State of Illinois except for her own presence (and therefore her injury) there.

Kleinman now argues that the SAC suffers from all the same defects and that the additional allegations do not strengthen the case for specific personal jurisdiction, and this Court agrees that many of the new allegations are irrelevant to specific personal jurisdiction in this case. For example, Bittman now argues: "Kleinman availed himself of Illinois laws by *filing* numerous state FOIA requests related to Ms. Bittman's position at the OPPL; *arranging* to appear and appearing via video teleconference at OPPL meetings that occurred in Orland Park, Illinois; and, *filing* a complaint with the Illinois Attorney General in relation to OPPL meetings and alleged violations of the Illinois Open Meetings Act." Mem. 5-6, ECF No. 117 (emphasis in original). This is activity that provides some connection between Kleinman and the state, but it bears at best a remote and tangential relationship with the defamation and false-light claims Bittman has asserted. Those claims plainly do not "arise out" of any of this conduct, and therefore, it does not support her case for specific personal jurisdiction over Kleinman with respect to the content of the July 8 video, the Republication Statement, or the Gay Hater Statement. *See Advanced Tactical,* 751 F.3d at 801 (to establish specific personal jurisdiction, it is the defendant's "suit-related" conduct that must create the substantial connection with the forum state).

Yet some of Bittman's new allegations are relevant to her argument for personal jurisdiction. Specifically, Bittman now alleges that Kleinman not only published the July 8 video on his own blog, but that he republished it in other online outlets that have more direct connections to Illinois than does Kleinman's own blog. He "provid[ed] a link to the July 8 Video in comments he made in response to articles found on" the Edgar County Watchdogs website, "on which articles appear relating to numerous counties in the State of Illinois." In those comments, he again "stated that Ms. Bittman 'attacked a gay man.'" Bittman further alleges that Kleinman "provid[ed] a link to the July 8 Video in comments he made to an article concerning the Orland Park Public Library on the website for the Chicago Tribune."

Kleinman contends that his comments on Illinois-based websites are of no import because "Plaintiff does not allege in her latest Complaint that Kleinman directed these comments to Illinois readers, or had any reason to believe that any statements made in the comment section of either website would be read widely here, or would reach a significant Illinois readership." Reply 8, ECF No. 119. He continues: "It is highly unlikely that any such statements—which were not in an article themselves, but rather buried in the comments below an article—would circulate widely. Additionally, though these websites are read by people in Illinois, they are also publicly available and accessible by anyone, anywhere (to a blogger in New Jersey, for example)." *Id*.

Kleinman's argument is not entirely persuasive. Bittman is entitled to reasonable inferences in her favor. According to the SAC, Kleinman "republished" the same allegedly defamatory July 8 video on both the Chicago Tribune and Edgar County Watchdogs websites. Although these websites may be ***accessible*** worldwide, it is reasonable to infer that their readership includes significant numbers of Illinois residents because they cover state and local news.

Even so, simply adding the allegations that Kleinman "republished" the July 8 video in the comments sections of two websites with (this court will assume) substantial Illinois readerships is not sufficient to confer specific personal jurisdiction over her claims. First, although the point is even more pertinent to the merits of Bittman's claims, a reference to a hyperlink is not likely to constitute "publication" for purposes of Illinois defamation law.[2] As this Court previously has noted: "[a] hyperlink . . . does not duplicate the content of a prior publication; rather, it identifies the location of an existing publication and, if selected, instructs a search engine to retrieve that publication." *Doctor's Data, Inc. v. Barrett*, ---F. Supp. 3d ----, No. 10 C 03795, 2016 WL 1086510, at *33 (N.D. Ill. Mar. 21, 2016). For this reason, several courts have concluded that displaying a hyperlink is not the same as restating the alleging defamatory material. *See id*. (collecting cases). For purposes of specific personal jurisdiction, Bittman's claims must arise directly from Kleinman's Illinois-based activities, but she can have no claim against him that arises from the simple posting of a hyperlink, which is not "publication" of material. Indeed, she does not appear to have broadened her defamation and false-light claims to include this alleged activity; she continues to focus only on the Republication Statement and the Gay-Hater statement.

Second, the interactive nature of online communication—which by its nature can be pursued from almost any location at any time—diminishes the jurisdictional import of those communications. *See Advanced Tactical*, 751 F.3d at 803. Particularly with respect to a publication like the Tribune website, with a substantial national readership, posting a comment to an online article seems several steps removed from deliberating targeting tortious communications toward an audience in a particular state. *Cf. NTE LLC v. Kenny Constr. Co.*, No. 14 C 9558, 2015 WL 6407532, at *3 (N.D. Ill. Oct. 21, 2015) ("[Visiting a website] is unlike

---

[2] A claim of defamation under Illinois law requires pleading that "the defendants made a false statement concerning [the plaintiff], that there was an unprivileged publication to a third party with fault by the defendant, which caused damage to the plaintiff." *Krasinski v. United Parcel Serv., Inc.*, 124 Ill. 2d 483, 490, 530 N.E.2d 468, 471 (1988).

8

other examples of minimum contacts because the act of visiting a website that is not situated in a specific geographical location does not purposefully avail the user of the protection and benefit of the server state's laws."); *Gullen v. Facebook.com, Inc.*, No. 15 C 7681, 2016 WL 245910, at *2-3 (N.D. Ill. Jan. 21, 2016) (use of interactive software by millions of Illini insufficient to provide specific personal jurisdiction over Facebook).In the posts that Bittman identifies, moreover, Kleinman was responding to content posted by others, rather than reaching into the state to disseminate defamatory material.

Finally, Bittman's vague and cursory descriptions of Kleinman's conduct also diminish the jurisdictional import of her new allegations; Bittman simply does not give sufficient detail about what Kleinman said, or where, or when, to assess the degree to which the alleged comments are suit-related or reflect efforts to injure Bittman in Illinois. The hyperlinks included in ¶ 16 of the SAC shed no further light, as they do not support Bittman's allegations. The one purporting to link to a Chicago Tribune article is defective. The link to the "Edgar County Watchdogs" website brings a post to which the commenter "safelibraries" posted a hyperlink to Kleinman's original July 27, 2014, blog post with no further statements. This has no relevance to Bittman's claims about the "gay hater statement" (Counts 8 and 9) and only a remote connection to the Republication Statement that is the subject of Counts 5 and 6. That connection is no stronger than the one in *Advanced Tactical* where directing emails to a list that included Indiana residents was deemed not to be behavior that "targeted" Indiana residents. 751 F.3d at 803-803. Indeed, Bittman does not allege that Kleinman's hyperlink directed any traffic to the Republication Statement; she instead complains that he made "comments" that are not further identified or explained in any way, *see* SAC ¶ 16, and that he linked to the July 8 video, *see* SAC ¶ 100. If sending emails directly to residents of the forum state does not equate to "deliberate actions by the defendant to target or direct [himself] toward the forum state," *Advanced Tactical*, 751 F.3d at 803, then it is difficult to conclude that the posting of undescribed comments in response to two online articles could do so.

Despite this Court's express suggestion that she do so if possible, Bittman has not alleged that Kleinman reached into Illinois to find sources in Illinois for his allegedly defamatory blog posts, nor has she provided any detail about how Kleinman allegedly worked "in concert with" Dujan or Fox with respect to his allegedly defamatory actions. *See* Order 7, ECF No. 89. Nor has Bittman added any detail regarding when, where, and to whom Kleinman allegedly made the "Gay Hater" and "homophobe" comments, even though this Court pointed out that confusing deficiency in the First Amended Complaint, *See* Order 2 n.2, ECF No. 89. It is only the posting of the unspecified "comments" and hyperlinks to the July 8 video that add anything to Bittman's original jurisdictional allegations against Kleinman. (As already noted, Kleinman's FOIA requests or complaints about the library board's closed meetings have nothing to do with Bittman's defamation claims.) Moreover, Bittman has not even mentioned, let alone attempted to distinguish, the Seventh Circuit's decision in *Advanced Tactical*, despite this Court's reliance on that case in dismissing the complaint against Kleinman the first time.

Therefore, Bittman has not made a prima facie case that her defamation and false-light claims against Kleinman arise from conduct that he purposefully directed at the State of Illinois. Unlike the publisher in *Calder*, Kleinman had no reason to believe that his blog had a substantial Illinois readership that would lead to reputational harm to Bittman in her home state. (Indeed,

Bittman still has not alleged that SafeLibraries has any Illinois readership.[3]) From the links provided in Bittman's SAC, it appears that Kleinman's target audience is an echo chamber of fellow critics of the American Library Association's open-Internet policies, not any particular regional constituency. Absent some plausible allegation that Kleinman, like the *Enquirer* in Calder, purposefully created and exploited his own contacts with the state in order to injure Bittman here, Bittman fails to sufficiently allege suit-related conduct by Kleinman that connects her claims to the forum state; her own forum-state injuries are not enough to provide that connection.

Because there has been no prima facie showing that Kleinman expressly directed any tortious conduct at the State of Illinois, rather than at an Internet audience of fellow activists, this Court further concludes that it would offend traditional notions of fair play and substantial justice to exercise personal jurisdiction over Kleinman. "[T[he weaker the defendant's contacts with the forum state are, the less likely it is that exercising jurisdiction over that defendant is appropriate." *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 759-60 (7th Cir. 2010). Indeed, where minimum contacts are lacking, "we need not go further in the personal-jurisdiction analysis." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 496 (7th Cir. 2014). In any event, although there is some efficiency interest in permitting Bittman to proceed against all the defendants in one lawsuit, and the State of Illinois has an interest in providing a forum in which its residents may obtain relief, Kleinman is an outlier among the Illinois-based defendants. The burden of compelling him to defend a lawsuit from across the country outweighs the other interests, given the tenuous connection between Kleinman's allegedly tortious conduct and the forum state.

\*\*\*

Accordingly, the motion to dismiss is granted based on a lack of personal jurisdiction over Kleinman, and Kleinman's other arguments for dismissal need not be considered. Bittman will be given no further leave to re-plead against Kleinman. She made poor use of her last opportunity to supply crucial details about litigation-specific contacts between Kleinman and Illinois and brought almost nothing new to bear in her second brief on personal jurisdiction, instead largely copying her original arguments. However, this dismissal is without prejudice to Bittman bringing her claims in a court that may properly assert jurisdiction over Kleinman.

---

[3] Bittman does assert: "Upon information and belief, a significant number of the Plaintiff's colleagues, peers and supervisors have become aware of and read the False and Defamatory Statements. Patrons of the Orland Park Public Library have become aware of and read the False and Defamatory Statements." SAC ¶¶ 147-148, ECF No. 91. However, "False and Defamatory Statements" in the context of the SAC refers to many statements that are not attributable to Kleinman, *see id*. ¶ 141, and Bittman nowhere alleges that anyone in Illinois read the Republication Statement or the Gay Hater statement on Kleinman's blog or that the blog has an Illinois readership. Moreover, the issue as to personal jurisdiction over Kleinman is not that some Illini have read the "False and Defamatory Statements"; that is simply another way of saying that Illinois is the locus of the plaintiff's injuries. But it is Kleinman's contacts with the state, not Bittman's, that determine whether the court may exercise specific personal jurisdiction over him.

Date: May 16, 2016

John J. Tharp, Jr.
United States District Judge